IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IRIS HENRY, | ) | |
| | ) | |
| Plaintiff, | ) | No. 04 C 4888 |
| | ) | |
| v. | ) | Suzanne B. Conlon, Judge |
| | ) | |
| TDS METROCOM, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Iris Henry sues TDS Metrocom under the Americans with Disabilities Act, 42 U.S.C. §

12112, *et seq.,* and for wrongful termination and retaliatory discharge. Henry, a former TDS

employee, alleges TDS terminated her employment because she was disabled (Count I), failed to

accommodate her disability (Count II), and retaliated against her for seeking workers' compensation

benefits (Count III). TDS moves for summary judgment on all counts pursuant to Fed. R. Civ. P.

56.

## BACKGROUND

### I.     TDS' Motion to Strike

TDS filed a statement of undisputed facts in accordance with Local Rule 56.1 ("TDS facts").

Henry responded to TDS' facts ("Henry Resp. facts") and filed a statement of additional undisputed

facts with attached exhibits as permitted by Local Rule 56.1 ("Henry facts"). TDS moves to strike

portions of Henry's response, facts and supporting exhibits on the grounds that they contradict her

deposition testimony and are conclusory and unsupported. More specifically, TDS moves to strike

19 paragraphs of Henry's affidavit, 50 paragraphs of Henry's response, over 75 paragraphs of

1

Henry's facts, and over 60 supporting exhibits. The court need not address each of the 200 challenged statements, responses and exhibits separately. The motion to strike is essentially duplicative of TDS' response to Henry's facts and wasteful of the court's resources. Inadmissible portions of the record need not be stricken. To the extent any statement, response or exhibit is not adequately supported, it will not be incorporated into the undisputed facts for purposes of ruling on the summary judgment motion. *See Liberty Mutual Ins. Co. v. Tokio Marine & Fire Ins. Co.*, 2004 U.S. Dist. LEXIS 21848, at *6 (N.D. Ill. Sept. 21, 2004). Accordingly, TDS' motion to strike is denied.

**II.     Facts**

All facts are undisputed unless otherwise noted. TDS provides telecommunications services such as voice and data lines to business customers. TDS facts ¶ 7. TDS has a sales office in Vernon Hills, Illinois. *Id.* at ¶ 3. Henry worked as a TDS account representative at the Vernon Hills sales office from January 5, 2003 through November 20, 2003. *Id.* at ¶ 40.

**A.  Account Representative Duties**

TDS employs account representatives at its Vernon Hills sales office. Henry Resp. facts ¶ 8. Account representatives are the primary source of generating new business revenue. TDS facts ¶ 11. They are responsible for selling voice and data lines to prospective business customers. TDS facts ¶ 12. TDS assigns each account representative an exclusive geographic sales territory in which only that account representative may sell TDS products. TDS facts ¶ 13.[1] Sales territories are based

---

[1]Henry denies this fact "is entirely true." Henry Aff. ¶ 3. Her conclusory denial is insufficient to rebut TDS' evidence. *See Mills v. First Fed. Sav. & Loan Assoc.*, 83 F.3d 833, 843 (7th Cir. 1996).

on the estimated number of voice and data lines within an area. *Id.* at ¶ 14. Each sales territory has approximately the same number of lines. *Id.* at ¶ 15.

TDS has a written job description for account representatives. Henry Resp. facts, Ex. 1. TDS provided Henry a copy of the written job description during a pre-employment interview. TDS facts ¶ 25. The job description lists seven essential functions. Henry Resp. facts, Ex. 1. Three of the essential job functions are:

(1)    Contact cold and warm prospective customers through a combination of telephone and in person contacts to obtain appointments (20%).

(2)    Make sales calls to determine customer needs and present viable TDS METROCOM solutions (20%).

(3)    Audit the prospect's existing CSR (customer service record) looking for billing inaccuracies. Design a tailored, cost-effective telecommunications solution. Prepare and present the solution in a professional manner using the available resources (20%).

*Id.* The written job description states: "While performing the duties of this job, the employee is regularly required to sit; frequently required to use hands to finger, handle, or feel; and talk or hear. The employee must occasionally lift and or move up to 10 pounds. . . ." *Id.*

Account representatives are responsible for traveling throughout their assigned sales territory to meet with prospective customers and to perform audits of existing customers. TDS facts ¶ 16.[2] The parties dispute whether face-to-face contact with prospective business customers is the *primary*

_____

[2]Henry denies this fact. Henry Resp. facts ¶ 16. In support of the denial, she cites the written job description. The written job description does not support her denial.

way account representatives accomplish their duties. *Id.* at ¶¶ 17-18; Henry Resp. facts ¶¶ 17-18. The written job description requires a combination of both "telephone and in person contacts. . . ." Henry Resp. facts, Ex. 1. Henry claims account representatives had discretion to work their territories as they saw fit, either making phone calls or traveling to meet directly with customers. TDS facts Ex. 2 at 65-66. Henry admits that a "main objective with an account representative was to be out in the field." TDS facts Ex. 2 at 65.

TDS generally expects its account representatives to travel to its Vernon Hills sales office on a daily basis, although they are allowed flexibility in their schedules. TDS facts ¶ 97, Ex. 2 at 66-67.[3] TDS trains its account representatives to use a "consultative" sales method with prospective business customers. *Id.* at ¶ 84. The consultative sales method is a process of meeting with prospective business customers and listening to their needs. *Id.* at ¶ 86.

### B. Henry's TDS Employment

Henry applied for an account representative position covering Lincolnshire and North Chicago as the exclusive sales territory. TDS facts ¶ 30. There were no other vacant sales territories when Henry was hired. *Id.* at ¶ 74.[4] During her initial interview, Henry was informed that the

---

[3]Henry denies this fact, citing the written job description. The job description does not support her denial.

[4]Henry denies this fact, claiming there "may have been some sales territories available that were closer to [her] home. . . ." Henry Aff. at 14. Henry's affidavit is too speculative to contradict her deposition testimony that there were no "unmanned" territories closer to her home than North Chicago and Lincolnshire. TDS facts, Ex. 2 at 64.

account representative position required cold calling and face-to-face meetings with prospective customers. *Id.* at ¶ 38, Ex. 2 at 50.[5]

Henry was hired as an account representative on January 5, 2003; she was assigned to cover the Lincolnshire and North Chicago sales territory. TDS facts ¶¶ 40, 66. She did not have any physical limitations from the date she was hired until May 21, 2003. *Id.* at ¶ 72. She was able to travel throughout her assigned sales territory from the date she was hired until May 21, 2003. *Id.* at ¶ 73. By car, Lincolnshire was approximately 1 hour and 15 minutes from her home. *Id.* at ¶ 75. North Chicago was approximately 20 minutes from her home when traveling by car. *Id.* at ¶ 77. The Vernon Hills sales office was approximately 1 hour and 15 minutes from her home by car. *Id.* at ¶ 96. Henry remained an account representative until November 20, 2003, when TDS terminated her employment. *Id.* at ¶¶ 40-41, 248.

## C. Henry's Duties as an Account Representative

Shortly after she was hired, TDS gave Henry a written business sales compensation plan that described how she would be compensated as an account representative. TDS facts Ex. 5(C). Henry signed the plan on February 3, 2003. *Id.* The plan states:

> Travel within the service territory is a prerequisite. Therefore, each sales professional must have access to a personal vehicle during working hours. Each sales professional is expected to have a valid driver's license and maintain the requisite automobile insurance called for in our Employee Handbook.

---

[5]Henry denies this fact, but her denial is not properly supported. Her conclusory affidavit directly contradicts her deposition testimony that she was told face-to-face contact with potential customers was a required job duty. TDS facts, Ex. 2 at 50-51. Her affidavit does not create an issue of fact on this point. *See United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 466 (7th Cir. 2005).

*Id.* When she signed the plan, Henry understood she would be required to travel by car within her assigned sales territory. TDS facts, Ex. 2 at 78.[6]

Henry spent more than 50% of her working time on the road in her assigned sales territory until May 21, 2003. TDS facts ¶ 79. Henry is unaware of any TDS account representative who spent less than 50% of working time on the road in her assigned sales territory. *Id.* at ¶ 81. Henry traveled to the Vernon Hills sales office daily until May 21, 2003. *Id.* at ¶¶ 98, 100. Henry is unaware of any account representative who did not report to the Vernon Hills sales office on a daily basis. *Id.* at ¶ 99. Henry presented service agreements to prospective business customers and hand-delivered service agreements to a TDS account coordinator at the Vernon Hills sales office. *Id.* at ¶¶ 90-91.

TDS established Henry's sales quota. *Id.* at ¶ 58. Beginning April 1, 2003, her quota was to sell 80 lines per month. *Id.* at ¶¶ 58, 63. Her quota was set forth in the written business sales compensation plan that she signed on February 3, 2003. *Id.*

**D.    Henry's Work Injury**

In May 2003, Henry reported that she was unable to work because of an alleged work injury to her neck, back, shoulder and arm that occurred earlier in May. TDS facts ¶¶ 109, 113. She submitted an accident report form to TDS in June 2003. *Id.* at ¶ 111. She reported that her injury resulted from carrying a laptop computer, a plastic carrying case, and a three-ring sales binder; she

---

[6]Henry denies her supervisor, John Fugate, told her during her interview that travel was required for the account representative position. Henry Resp. facts ¶ 37. Whether she was told about the travel requirements during her initial interview is immaterial. It is undisputed as of February 3, 2003, she knew she would be required to travel within her sales territory. TDS facts, Ex. 2 at 78.

moved those materials back and forth between the Vernon Hills sales office and her vehicle. *Id.* at ¶ 112.

Henry presents evidence she was diagnosed with a herniated disc. Henry facts Ex. 27, 78. Her physician notified TDS of the diagnosis on November 12, 2003. *Id.* at Ex. 27. According to Henry, the herniated disc caused her pain when sitting, bending, standing and lifting. *Id.* at Ex. 78 at 4. She presents evidence that her condition limited her ability to sit and drive for more than 30 minutes at a time. *Id.* at ¶ 27. She testified that because of her condition, she needed assistance grooming herself, cleaning her house, doing laundry and cooking. TDS facts Ex. 2, at 121, 235.

On June 3, 2004, Henry underwent cervical fusion surgery on her neck. *Id.* at ¶ 126. As of January 26, 2005, Henry was still totally incapacitated from performing any work and had not been released to perform work. *Id.* at ¶ 127.

### E. Henry's Medical Leave of Absence

Henry requested a medical leave of absence in late May 2003. TDS facts ¶ 129. Henry's physician submitted a disability certificate to TDS stating that Henry was incapacitated and unable to work from May 20, 2003 through June 5, 2003. Henry facts ¶ 7. TDS denied Henry's request for leave under the Family and Medical Leave Act, but approved her request for a medical leave of absence commencing May 21, 2003. TDS facts ¶ 130. Henry remained out on an approved medical leave of absence from May 21, 2003 through October 2, 2003. *Id.* at ¶ 132. Her physicians submitted disability certificates stating she was unable to work during the entire time she was out on medical leave. Henry facts ¶¶ 13, 19, 20, 21, 22. She was unable to drive during her medical leave of absence. TDS facts ¶ 133. After October 2, 2003, she continued to have problems driving. *Id.* at ¶ 134.

7

## F.  Henry's work restrictions

Henry returned to work in the same position on October 6, 2003, with work restrictions from her physician. TDS facts ¶¶ 163, 167. The work restriction stated that Henry was capable of performing light work duties with "no lifting 10-15 lbs" and "no continuous driving 45-60 minutes." *Id.* at ¶ 164. TDS allowed Henry to return to work within the work restrictions. *Id.* at ¶ 167. TDS temporarily allowed Henry to work from home while it explored potential accommodation options. *Id.* at ¶ 270; Henry Facts Ex. 79 at 80-81.

TDS reduced her minimum monthly sales quota for October from 80 lines to 26 lines. TDS facts ¶ 174. Henry did not meet her minimum sales quota for October. *Id.* Henry received credit for selling seven lines in October 2003. *Id.* at ¶ 175. TDS reduced Henry's sales quota for November from 80 lines to 52 lines. *Id.* at ¶ 177. Henry did not meet the reduced monthly sales quota for November. *Id.* She received credit for selling 10 lines between November 1 and her termination on November 20, 2003. *Id.* at ¶ 178. She continued to schedule and attend face-to-face appointments with customers in October and November 2003. Henry facts ¶¶ 49-84.

After she returned to work from her leave of absence, Henry stopped traveling to Lincolnshire. TDS facts ¶ 180. The parties dispute whether TDS allowed her to stop traveling to Lincolnshire after she returned to work. Henry Aff. ¶ 19; TDS Facts ¶ 182. There is evidence Henry's supervisor and a human resources manager told her she was not required to travel to Lincolnshire after she returned from her medical leave and while they explored potential accommodations. TDS Facts Ex. 5(F) at AB 0126; Henry facts Ex. 79 at 62-63. After she returned from leave, Henry stopped traveling to the Vernon Hills sales office except for a "few times." TDS facts ¶ 183. She told her supervisor at the end of October 2003 that she was doing a lot of work from

home by telephone and that it was easier for prospective customers to "put [her] off" over the phone than when she was there in person. *Id.* at ¶¶ 190-191.[7]

Around November 4, 2003, Henry faxed TDS a new work restriction that stated in part "No sitting/standing for more than 30 minutes without a rest. This includes driving. These limitations are in effect indefinitely." *Id.* at ¶ 194. On November 18, Henry's physician ordered the previous work restrictions to remain in effect pending a functional capacity test scheduled for the following week. Henry facts ¶ 30, Ex. 28.[8]

### G.    Potential Accommodations

On November 5, 2003, TDS employee relations manager, Kelly Imhoff, twice called Henry to explore potential accommodations that might allow Henry to increase her performance level. TDS facts ¶¶ 195-196. During the first November 5, 2003 conversation, Imhoff asked Henry if she had any suggested accommodations. *Id.* at ¶ 197. The parties dispute whether Henry suggested any accommodations. Henry Resp. facts ¶ 198. There is evidence she did. Henry testified, "She [Imhoff] would be checking on whether or not that situation – as far as me being able to work from home. She was certain that it wasn't, but she was going to check." TDS facts Ex. 2 at 202. Moreover, Henry's affidavit attests that she requested a new sales territory, part-time employment,

---

[7]Henry denies this fact, citing her affidavit. Henry Resp. facts ¶¶ 190-191. Her affidavit does not contain any specific facts supporting the denial and is too conclusory to create a factual issue. *See Mills v. First Fed. Sav. & Loan Assoc.*, 83 F.3d 833, 843 (7th Cir. 1996). Moreover, her affidavit directly contradicts her deposition testimony. *See* TDS Motion to Strike Appendix at 204-207.

[8]TDS objects to Henry's Exhibit 28, which is a prescription from Henry's physician ordering the previous work restrictions to remain in effect pending the functional capacity test. This objection to the November 18 prescription is disingenuous because TDS relies on previous work restrictions ordered by Henry's physicians. TDS facts ¶¶ 164, 194. The record would be incomplete if only some restrictions were considered. *See* Fed. R. Evid. 106.

to work from home and a prolonged leave of absence. Henry Aff. ¶ 33. She does not state when or to whom she made these requests.

Henry informed Imhoff during the November 5 telephone call that she had medical treatments scheduled in the next couple of weeks. Henry facts ¶ 1.

Imhoff maintained detailed typewritten notes of her November 5 telephone conversations with Henry. Her notes of the first conversation state:

> HR: As you know and I had mentioned, quota is very important in this type of position. And you need to maintain a rolling average of 70% quota attainment for the last three months to stay off of a sales quota ORI. I understand that you are having some difficulty making your numbers. . . .You are not at the sales ORI point yet, but we want to do what we can to prevent that from happening. What is it that you need from us in order to meet those expectations?
>
> IH: I don't know. . . . One of the things I am having an issue with is sitting for long periods of time. Because of my situation I am not able to do the cold calling that I could before and because of the distance from my home out to Lincolnshire, I am having a hard time having face to face meetings there. . . .
>
> HR: Didn't John adjust your territory when you came back?
>
> IH: I am still in the same territory. There was never an adjustment made for my territory. My line quota was adjusted. North Chicago is my territory and then there is Lincolnshire.
>
>         *     *     *
>
> HR: I believe John made some type of adjustment when you came back, what was that?
>
> IH: Yes, that I could work from home. And they gave me a fax machine that I could use so that I could fax the paperwork for my appointments ahead of time. . . .
>
> HR: North Chicago is ok because that is about 20 minutes away from your house?
>
> IH: Yes, but Lincolnshire is hard because it is so far out. Just sitting for the long periods of time without rest.

*       *       *

        HR:  So, for the next couple of weeks you will continue to set appointments and
        when something is close to North Chicago to go there?

        IH:  Yes, I will be there.

TDS facts Ex. 5(F).

        Imhoff's notes of the second November 5 telephone conversation state:

        HR:  I understand that one of the things John has allowed you to do is to work from
        home.  I wanted to let you know that the company has standards on working from
        home and we do not allow it so I will just need to see if we can continue that.

        IH:  So, will that leave me without a job?

        HR:  No, that is just one of the things that we will have to look at and talk about
        through this process.  It might be that we make other adjustments for you so that you
        can continue to do your job.  Right now, continue to do what you are doing.

        IH:  I have been doing this for 4 weeks now.

        HR:  I understand that.  I will just need to look into that and then we can talk more
        about it.

*Id.*

        Henry and Imhoff again spoke about potential accommodations on November 10, 2003.  *Id.*

at ¶ 211.   Imhoff informed Henry that TDS needed additional information to explore potential

accommodations.  *Id.* at ¶ 212.  Henry agreed to allow TDS to contact her physician for additional

information regarding her condition.  *Id.* at ¶ 214.

        Imhoff contacted Henry's physician.  *Id.* at ¶ 218.  Henry's physician responded by letter on

November 14, 2003.  The letter stated that Henry needed accommodations with the length of driving

time and the frequency of driving.  *Id.* at ¶¶ 219-220.  The letter stated that driving should be limited

                                            11

"to probably a maximum of 30 minutes at a time, if this can be helped in her job description." *Id.* at ¶ 220.

On November 18, 2003, TDS employee relations manager, Teresa Nichols, called Henry to discuss potential accommodations. *Id.* at ¶ 225. Nichols asked Henry whether she had any proposed accommodations; Henry responded she did not. *Id.* at ¶¶ 230-231.[9] Nichols told Henry TDS was not terminating her employment and asked Henry to try to think of an accommodation that would allow her to perform her job. *Id.* at ¶ 233. Henry told Nichols her physician had scheduled a functional capacity test for the following week. Henry facts ¶ 2.

On November 19, 2003, Nichols called Henry again to discuss a potential accommodation. Nichols suggested Henry try taking frequent breaks while driving so that she could get out of her vehicle and stretch. TDS facts ¶ 238. Henry agreed to try Nichols' suggested accommodation. *Id.* at ¶ 240. Henry told Nichols that she was scheduled to receive medical treatment for her condition on the following Monday. Henry facts ¶ 3.

## H. Henry's Termination

On November 20, 2003, Henry called Nichols and left a voice mail message stating that she had just returned from two appointments and was not "doing very good at all. I left here about 8:37 a.m. and got back around 10:37 a.m." TDS facts ¶ 241. Nichols returned Henry's call the same day. *Id.* at ¶ 242. Henry told Nichols and Fugate that she had tried taking frequent breaks while driving and still was not feeling well. *Id.* at ¶¶ 243-244.[10] TDS terminated Henry's employment during the

---

[9]Henry denies the facts asserted in TDS Facts ¶¶ 230 and 231, but her conclusory denials are insufficient to create a genuine factual dispute. *See Mills,* 83 F.3d at 843.

[10]Henry denies this fact, but her conclusory assertions that ¶¶ 243-246 of TDS facts are inaccurate do not create a genuine disputed factual issue. *See Mills,* 83 F.3d at 843.

November 20, 2003 telephone call. *Id.* at ¶¶ 248, 250. TDS claims it terminated Henry's employment because she was unable to perform the essential functions of her job with or without accommodation. *Id.* at ¶ ¶251, 255. More specifically, TDS claims Henry was terminated because her supervisors and the human relations managers concluded she was unable to travel throughout her assigned sales territory of Lincolnshire and North Chicago to make face-to-face cold calls on a daily basis and was unable to travel to the Vernon Hills sales office on a daily basis. *Id.* at ¶¶ 255-261.

TDS did not wait for the results of Henry's functional capacity test scheduled for the following week before terminating her employment on November 20. Henry Aff. ¶ 64. TDS does not identify who made the decision to terminate Henry's employment. It relies on affidavits from six sales managers and human relations employees, including Fugate, Nichols and Imhoff, to support its stated reason for Henry's termination. TDS facts ¶ 250. Presumably these six people were involved in the decision to terminate Henry's employment.

Between October 6, 2003 and November 20, 2003, there were no vacant sales territories closer to Henry's house than her assigned sales territory. All of the sales territories were already assigned to other account representatives. TDS facts ¶ 252. As of November 20, 2003, when Henry was terminated, there were no available job openings for which she was qualified within her work restrictions. *Id.* at ¶ 253.[11]

---

[11]Henry disputes this fact based on her "belief" that there were available positions for which she was qualified. Henry Resp. facts ¶ 253; Henry Aff. ¶ 32. Henry has not shown that her belief is based on personal knowledge. Accordingly, her affidavit lacks foundation and is too speculative to create a disputed factual issue. *See Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003).

## I.     Workers' Compensation Claim

Henry filed a workers' compensation claim. TDS facts ¶ 117.[12] TDS forwarded her workers' compensation claim to its third-party administrator, Sentry Insurance, for processing. *Id.* Sentry denied Henry's claim. *Id.* at ¶ 120.

Imhoff and Nichols were kept apprised of the status of Henry's claim. Henry facts Ex. 35, 36. On August 29, 2003, Imhoff asked the benefits department whether Henry was receiving workers' compensation benefits. Henry facts Ex. 35. The benefits department responded that Henry's claim had been denied and was on appeal. *Id.* On November 17, 2003, Imhoff again asked the benefits department about the status of Henry's workers' compensation claim. *Id.* at Ex. 36. The benefits department responded to Imhoff and Nichols that Henry's claim was still on appeal, Henry had made prior workers' compensation claims with other employers and Sentry had sent out subpoenas to Henry's previous employers to obtain records of her prior claims. *Id.*

Henry admits no one made any comments to her about her workers' compensation claim. TDS facts ¶ 272.

## J.     Social Security Disability Benefits

On March 24, 2004, Henry applied for social security disability benefits. Henry Resp. supp. facts ¶ 1. On January 13, 2005, the Social Security Administration ("SSA") awarded Henry disability benefits retroactive to May 2003. Henry Resp. supp. facts ¶ 2.

---

[12]Neither party states when Henry filed her workers' compensation claim. Presumably her June 2003 accident report form initiated the workers' compensation claim.

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment is appropriate when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *King v. National Human Resource Committee, Inc.*, 218 F.3d 719, 723 (7th Cir. 2000). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and identifying evidence that demonstrates the absence of a genuine issue of material fact. The non-moving party must then come forward with evidence and designate specific facts that establish there is a genuine triable issue. *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992). A genuine issue of material fact exists when the evidence would support a reasonable jury verdict for the non-moving party. *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).

### II.    Analysis

TDS first argues summary judgment should be granted on Henry's disability discrimination claims in Counts I and II because she cannot establish a *prima facie* case of discrimination under the Americans with Disabilities Act ("ADA"). TDS argues there is no evidence Henry was disabled, capable of performing her essential job functions or that she was terminated because of her alleged disability. TDS next argues there is no evidence it failed to reasonably accommodate Henry's alleged disability and that Henry's proposed accommodations would have resulted in undue hardship. Finally, TDS argues summary judgment should be granted on Henry's retaliatory discharge claim in Count III because there is no evidence her termination was causally connected to filing a worker's compensation claim.

15

## A.  Disability discrimination

Under the ADA, it is unlawful for an employer to "discriminate against a qualified individual with a disability because of the disability . . . in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a).  Two distinct categories of disability discrimination exist under the ADA: disparate treatment and failure to accommodate. *Lutter v. Rinella Beverage Co.*, 2004 U.S. Dist. LEXIS 1536, at *12 (N.D. Ill. Feb. 4, 2004).  Henry asserts claims under both categories in Counts I and II of her complaint.

Any claim for discrimination under the ADA requires a showing that Henry was a qualified individual with a disability.  42 U.S.C. § 1221(a); *Lutter*, 2004 U.S. Dist. LEXIS 1536, at *13.  To establish a *prima facie* claim of ADA discrimination , Henry must show: (1) she was disabled within the meaning of the ADA; (2) she was qualified to perform the essential functions of her job with or without a reasonable accommodation; and (3) she suffered an adverse employment action.  *Dvorak v. Mostardi Platt Assocs.*, 289 F.3d 479, 483 (7th Cir. 2002).  TDS challenges the sufficiency of the evidence with respect to all three elements.

### 1.  Disability

Henry must first establish the "initial element of an ADA claim, *i.e.*, that she suffers from a 'disability' as defined in the Act." *Homeyer v. Stanley Tulchin Assoc., Inc.*, 91 F.3d 959, 961 (7th Cir. 1996).  The ADA defines disability as "a physical or mental impairment that substantially limits one or more of the major life activities of an individual." 42 U.S.C. § 12102(2).  Major life activities refer to activities that are of central importance to an individual's daily life, and include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and

16

working." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002); 29 C.F.R. § 1630.2(i). Other major life activities include sitting and standing. *Arnold v. County of Cook*, 2001 U.S. Dist. LEXIS 22647, at *8 (N.D. Ill. Sept. 25, 2001). Substantially limited means that the person is either unable to perform a major life function or is "significantly restricted as to the condition, manner or duration" under which the individual can perform a particular major life function, as compared to the average person in the general population. *Dvorkek*, 289 F.3d at 483; 29 C.F.R. at 1630.2(j).

TDS argues Henry has no admissible evidence she was disabled at the time of her termination, as there is no evidence Henry was substantially limited in performing a major life activity. Henry testified she had problems grooming, such as washing her hair, cooking and cleaning. TDS facts Ex. 2 at 120-121, 235. TDS argues Henry's deposition testimony is inadmissible because it is not included in her Local Rule 56.1 statement. TDS' argument must be rejected because Henry's cited deposition testimony is attached to both parties' Local Rule 56.1 statements. TDS facts Ex. 2; Henry facts Ex. 76.

Henry testified she had problems washing her hair, cooking and cleaning and needed assistance from her daughter to perform these basic functions. Henry facts Ex. 76 at 121-122. TDS argues the testimony is too conclusory to create a disputed factual issue. Bald assertions that a plaintiff is limited in performing major life activities, without any explanation regarding the extent and duration of the limitations, are insufficient to create an issue of fact regarding disability. *Contreras v. Suncast Corp.*, 237 F.3d 756, 764 (7th Cir. 2001). Henry's deposition testimony provides sparce detail on the extent and duration of her limitations. However, the court need not decide whether her testimony standing alone is sufficient to withstand summary judgment because

there is additional evidence Henry was substantially limited in performing other major life activities. There is evidence Henry was unable to sit or stand for more than 30-60 minutes at a time from the date she returned to work in October 2003 through her termination in November 2003. TDS facts ¶¶ 164, 194, 220; Henry affidavit ¶ 60-63; Henry facts Ex. 27, 28. On January 27, 2005, the Social Security Administration determined Henry was disabled and awarded her disability benefits retroactive to May 2003. TDS supp. facts ¶¶ 1-2. A reasonable jury could conclude from this evidence that Henry was substantially limited in the major life activities of sitting and standing. *See Lawson v. CSX Transportation, Inc.*, 245 F.3d 916, 927 (7th Cir. 2001) (SSA determination of disability can be relevant and significant evidence in showing that disability exists under ADA); *Gabriel v. City of Chicago*, 9 F. Supp. 2d 974, 982-3 (N.D. Ill. 1998) ("Gabriel's testimony that she could not stand for long periods of time throughout most of her pregnancy permits a finding that she was 'significantly restricted as to the condition, manner and duration' of her ability to stand, as compared to the average person."). Henry has presented sufficient evidence to withstand summary judgment with respect to the first *prima facie* element.

### 2. Capable of Performing Essential Functions

Once an ADA claimant has established that she is disabled, she must also show that she is a qualified individual. *Lutter*, 2004 U.S. Dist. LEXIS 1536, at *28. The ADA provides a relevant definition and guidance:

> The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

18

42 U.S.C. §12111(8).

TDS argues there is no evidence Henry was able to perform the essential functions of her job with or without accommodation. TDS asserts Henry was unable to travel to her assigned territory on a regular basis, engage in any significant face-to-face cold-calling in her assigned sales territory, or travel from her home to the Vernon Hills sales office, except for a few times. According to TDS, each of these are essential functions of the account representative job. Henry disputes that these were essential functions of the job.

The court must first determine the essential job functions. TDS had a job description for the account representative position before Henry was interviewed. The job description identified essential functions as contacting prospective customers through a combination of telephone and in person contacts, making sales calls to determine customer needs, and presenting solutions to customers. Henry admits a "main objective with an account representative was to be out in the field." TDS facts Ex. 2 at 65. She also admitted it was much more difficult to close a sale over the telephone than in person. TDS facts ¶¶ 190-191. Moreover, the compensation plan identified travel within the assigned sales territory as an essential function of an account representative. Given this undisputed evidence, there is no factual issue that traveling by car to visit customers at their offices was an essential function of the account representative position.

In support of her argument that driving to Lincolnshire was not an essential job function, Henry presents evidence that TDS allowed her to restrict her sales calls to North Chicago after she returned from medical leave, and that Fugate told the human resources manager on November 6 that she would be able to meet her 80-line quota with just the North Chicago territory "for a while, but not on a consistent basis." Henry facts, Ex. 38. Viewing this evidence in Henry's favor, it does not

create a factual issue whether making face-to-face sales calls on Lincolnshire customers was an essential function of Henry's job. The job description and compensation plan clearly identify that an essential function of an account representative is to make face-to-face sales calls on customers within the representative's assigned sales territory. It would not be reasonable to conclude that traveling to Lincolnshire was not an essential job function simply because TDS temporarily relieved Henry of her travel obligation to Lincolnshire while exploring potential accommodations.

TDS also claims traveling to the Vernon Hills sales office on a daily basis was an essential function of the job. The job description does not identify driving to Vernon Hills as an essential job function. TDS fails to provide evidence that physical presence at the Vernon Hills office, rather than the work conducted while at the office, was an essential job function. Nor is there evidence that office work usually conducted in Vernon Hills could not be conducted from home. Indeed, after Henry returned from her leave of absence, TDS allowed her to do her office work from home by telephone and facsimile. This evidence creates an issue of fact whether physical presence at the Vernon Hills office, rather than the work usually performed at the office, was an essential function of the job.

The next question is whether Henry was able to perform the essential job functions with or without accommodation. TDS argues Henry was unable to perform the essential function of driving to her assigned Lincolnshire territory to make face-to-face customer sales calls. Henry presents evidence she was able to contact prospective customers through telephone and in-person contacts, make sales calls, and drive to customers' offices in part of her assigned territory. Henry facts ¶¶ 48-84. She was able to drive to customers located in North Chicago because they were less than 30 minutes from her home. However, she was unable to drive for more than 30 minutes at a time,

20

which affected her ability to visit customers in the Lincolnshire portion of her sales territory. The undisputed evidence shows that Henry was unable to perform the essential function of driving to meet with Lincolnshire customers without accommodation.

### C.   Reasonableness of Accommodations

Henry argues TDS should have reasonably accommodated her inability to drive to Lincolnshire by allowing her to work from home, assigning her a closer sales territory, allowing her to work part-time, granting her an additional leave of absence, or placing her on a performance improvement plan. TDS argues Henry failed to request these accommodations prior to termination and that these measures are unreasonable. Henry's affidavit attests she requested a new sales territory, part-time employment, to work from home and a prolonged leave of absence. Henry Aff. ¶ 33. There is evidence Henry and TDS discussed potential accommodations such as working from home and reorganizing her territory. Henry facts Ex. 5 (F). Viewing this evidence in Henry's favor, a reasonable jury could conclude Henry requested accommodations prior to her termination

Henry carries the burden of presenting evidence that a reasonable accommodation existed that would have enabled her to perform the essential functions of her job. *Mays v. Principi*, 301 F.3d 866, 871 (7th Cir. 2002). An employer is only required to accommodate an employee if the reasonable accommodation would permit the employee to perform essential job functions. *Gile v. United Airlines, Inc.*, 213 F.3d 365, 372 (7th Cir. 2000).

### a.   Working from Home

Henry claims TDS failed to reasonably accommodate her disability by refusing to allow her to work from home. Working from home would eliminate Henry's need to drive to the Vernon Hills office, but it would not eliminate the need to drive to Lincolnshire to make face-to-face sales calls.

Thus, working from home would not have enabled Henry to perform the essential function of driving to Lincolnshire for face-to-face customer meetings. Henry has not shown that this requested accommodation would have permitted her to perform the essential functions of her job. To the extent Henry requested permission to conduct business by telephone from her home and have another employee attend face-to-face sales calls, the requested accommodation was unreasonable. This proposed accommodation would have required TDS to reallocate essential functions of Henry's job to another employee. This is not required under the ADA. *Lutter*, 2004 U.S. Dist. LEXIS 1536, at *29, *citing, Basith v. Cook County*, 241 F.3d 919, 929 (7th Cir. 2001).

### b.    Reassignment to New Territory

Henry claims TDS should have assigned her to a closer sales territory so that she would not be required to drive more than 30 minutes. TDS argues assigning Henry a new sales territory is an unreasonable accommodation as a matter of law. TDS relies on *Jay v. Intermet Wagner, Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000), holding that an employer is not required to shuffle job responsibilities among employees or create a position to accommodate a plaintiff's disabilities.

The undisputed evidence shows there were no sales territories closer to Henry's home that were not already assigned to another account representative from the date Henry returned from leave through her termination. Henry Resp. facts ¶ 252. Under these circumstances, TDS was not obligated to shuffle assigned sales territories in order to accommodate Henry's disability. *Id.*; *Green v. Pace Suburban Bus*, 2004 U.S. Dist. LEXIS 12956, at *55 (N.D. Ill. July 9, 2004) (employer does not have to "bump" employee to create vacancy for disabled employee). Nor was TDS obligated to reallocate Henry's assigned Lincolnshire territory to another employee or to create a new territory closer to Henry's home. *Lutter*, 2004 U.S. Dist. LEXIS 1536, at **29, 36.

22

### c.    Working Part-Time

Henry claims TDS failed to reasonably accommodate her by refusing to allow her to work part-time. TDS argues part-time employment would not have overcome Henry's inability to drive to Lincolnshire and would be an unreasonable accommodation for the full-time account representative position. Part-time employment would not have enabled Henry to drive to Lincolnshire. To the extent Henry claims TDS should have allowed her to work part-time covering only the North Chicago portion of her territory, the requested accommodation is unreasonable. A part-time schedule is not a reasonable accommodation for a full-time job and an employer is not required to reallocate portions of an employee's essential job functions to other employees. *DeVito v. Chicago Park District*, 270 F.3d 532, 533 (7th Cir. 2001) (part-time employment); *Basith v. Cook County*, 241 F.3d 919, 932 (7th Cir. 2001) (reallocation of essential functions); *see also Caroselli v. Allstate Ins. Co.*, 2004 U.S. Dist. LEXIS 2778, at *13-14 (N.D. Ill. Feb. 20, 2004) (part-time employment).

Moreover, Henry presents no evidence that other account representatives were allowed to work part-time covering only part of an assigned territory. TDS' human resources policy refers to part-time employees. However, this does not establish TDS allowed *account representatives* to work part-time. There is no evidence TDS failed to reasonably accommodate Henry by refusing to allow her to work part-time.

### d.    Additional Leave of Absence

Henry argues TDS should have allowed her an additional leave of absence. As support for this argument, she points to a human resources policy that requires an employee to return to work for three consecutive months before she is eligible for another short-term leave of absence. Henry

facts Ex. 2. Henry argues TDS terminated her employment on November 20, 2003 before she could become eligible for an additional short-term leave of absence. She returned to work in October 2003 and would not have been eligible for another leave until January 2004. There is no evidence TDS terminated Henry's employment on November 20 in order to avoid her eligibility for another leave of absence in January 2004.

TDS argues an additional leave of absence would not be a reasonable accommodation because Henry's physician did not order another leave and a further leave of absence would have resulted in the continued neglect of her sales territory. In *Carter v. General Electric Company*, 2000 U.S. Dist. LEXIS 3875, at * 14 (N.D. Ill. March 21, 2000), summary judgment was denied because Carter presented evidence that General Electric failed to reasonably accommodate her disability by allowing her additional leave. Carter was unable to work due to her fibromyalgia for approximately four months at the time of her termination and her doctor believed she could return to work after another month of leave. *Id.* Carter did not seek an indefinite leave of absence. General Electric did not present any evidence that Carter's request placed an undue burden on its business operations. *Id.*

Unlike *Carter*, Henry presents no evidence that she would have been able to return to her position and perform her essential job functions if given an additional leave of absence. There is no evidence Henry's physicians believed she would be able to drive to Lincolnshire within a few months of her termination. Indeed, her physician ordered the driving restrictions "indefinitely." TDS facts ¶ 194. Nor is there any evidence her physicians ordered another leave of absence for a short period of time. In sum, there is no evidence this requested accommodation would have enabled Henry to perform the essential functions of her job.

Henry presents evidence that she told TDS about her functional capacity test and additional doctors' appointments scheduled for the week after her termination. TDS facts Ex. 5(F). She argues this shows TDS failed to reasonably accommodate her because TDS did not wait for the results before terminating her employment. This evidence does not create a factual issue sufficient to withstand summary judgment because there is no evidence Henry would have been able to perform her essential job functions after returning from another short term leave of absence. The evidence is to the contrary. Henry admitted that as of January 26, 2005, she was "still totally incapacitated from performing any work whatsoever and had not been released to perform any work." Henry Resp. facts ¶ 127. Accordingly, there is no evidence TDS failed to reasonably accommodate Henry by failing to grant her an additional leave of absence.

### e. Performance Improvement Plan

Finally, Henry argues TDS should have accommodated her by placing her on a performance improvement plan before terminating her employment. TDS responds that performance improvement plans are for employees who do not meet their sales quota because of performance, not because of a physical restriction. As set forth above, Henry must establish that the proposed accommodation would enable her to perform essential job functions. *Gile*, 213 F.3d at 372. Placing her on a performance improvement plan is not an accommodation that would have allowed her to make face-to-face sales calls on Lincolnshire customers. Although placing her on a performance improvement plan may have delayed her termination, Henry has not shown she would have been able to perform her essential job functions after the performance improvement plan ended.

25

### f.    Conclusion

Henry has failed to satisfy her *prima facie* burden of showing she was a qualified individual with a disability under the ADA. She has no evidence she was able to perform an essential function of her job – traveling to the Lincolnshire portion of her sales territory, with or without reasonable accommodation. Summary judgment must therefore be granted for TDS on Henry's disability discrimination claims in Counts I and II.

### B.    Retaliatory Discharge Claim

Henry claims TDS terminated her employment in retaliation for filing a workers' compensation claim. TDS moves for summary judgment on the ground that Henry has no evidence her termination was causally connected to filing a workers' compensation claim. In order to establish a retaliatory discharge claim, Henry must prove: (1) her status as an employee; (2) she filed a workers' compensation claim; and (3) a causal relationship between her termination and filing the workers' compensation claim. *Carter v. Tennant Co.*, 383 F.3d 673, 677 (7th Cir. 2004); *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994). TDS challenges the third element only.

The ultimate issue in considering causation is the employer's motive in discharging the employee. *Lutter*, 2004 U.S. Dist. LEXIS 1536, at *53. Although timing may be probative of motive under Illinois retaliatory discharge law, the timing of the discharge standing alone is not enough. *Id.* at *54. In other words, the causality requirement requires more than the sequential connection of the filing of a workers' compensation claim followed by termination. *Roger*, 21 F.3d at 149. Because an employer can discharge an at-will employee for any reason at all, it need not provide a legitimate reason for its decision to discharge unless the employee proffers sufficient evidence that could reasonably support a jury finding that the employer was improperly motivated.

*Id.* Nevertheless, if the employer has a legitimate, non-retaliatory reason for the termination, then the causation element is not met. *Artis v. Palos Community Hospital*, 2004 U.S. Dist. LEXIS 20150, at *30 (N.D. Ill. Sept. 22, 2004).

Henry argues there is sufficient evidence that TDS terminated her employment because of her workers' compensation claim. She presents evidence that TDS wanted her to see the company doctor, TDS personnel discussed her workers' compensation appeal, and a TDS employee was assigned to assist Sentry with Henry's appeal. Henry presents evidence that just days before her termination, TDS management inquired about the status of her appeal. According to Henry, this evidence creates a strong inference that the appeal was of paramount concern to TDS management and is sufficient to withstand summary judgment as to the causation element. Henry's arguments must be rejected.

First, Henry filed her workers' compensation claim in June 2003. She was terminated five months later on November 20, 2003. This five-month gap between the filing of her workers' compensation claim and her termination does not raise an inference of retaliation. *See Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four-month gap between filing discrimination complaint and disciplinary letters did not raise inference of retaliation). Second, none of the evidence cited by Henry relates to TDS' motive for terminating her employment. Simply because TDS personnel knew of her worker's compensation claim and inquired about its status does not suggest her termination was motivated by retaliation for the claim. Third, TDS has offered a legitimate, non-discriminatory reason for Henry's termination – she could not perform the essential functions of her job with or without accommodation. Henry has presented no evidence that the

stated reason is pretextual. Summary judgment must therefore be granted in favor of TDS on Count III.

## CONCLUSION

The material facts are undisputed. TDS Metrocom is entitled to judgment as a matter of law on all three counts of the complaint.

July 8, 2005

ENTER:

Suzanne B. Conlon
United States District Judge